No.   92-552

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

THOMAS NEIL SULLIVAN,

       Defendant and Appellant.

APPEAL FROM:   District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

              Turner C. Graybill and George Robert Crotty, Jr.,
Graybill, Ostrem & Crotty, Great Falls, Montana

       For Respondent:

              Hon. Joseph P. Mazurek, Attorney General,
Micheal S. Wellenstein, Assistant Attorney
General, Helena, Montana

              Patrick L. Paul, Cascade County Attorney,
Great Falls, Montana

FILED

SEP 12 1994
Filed:

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:   April 21, 1994

Decided:   September 12, 1994

Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Defendant Thomas Neil Sullivan appeals from a verdict of the Eighth Judicial District, Cascade County, finding him guilty of three counts of felony theft, one count of felony accountability for tampering with public records, and a judgment requiring him to pay a fine to a charity from vacation and sick pay.

We affirm in part, reverse in part, and remand to the District Court for further proceedings.

We state the issues as follows:

1. Did the District Court err in failing to hold an omnibus hearing at least 30 days prior to trial pursuant to § 46-13-110, MCA, thereby prejudicing defendant?

2. Did prejudicial media publicity, and the District Court's refusal to grant challenges for cause, preclude a fair trial for defendant?

3. Did the District Court err by limiting the testimony of Sue Duarte, excluding the testimony of Richard Duarte, and failing to grant defendant's motion for a mistrial?

4. Did the District Court err in refusing to dismiss or reverse Counts I, III, IV, and V of the information on the grounds of insufficiency of evidence?

5. Did the District Court err in fining defendant his vacation pay and sick leave pay and ordering distribution of these funds to United Way of Cascade County?

Tom Sullivan was employed by the City of Great Falls from 1963 until August 29, 1991. He became director of the City's Recreation

2

Department in 1965 and directed the City's consolidated "Park and Recreation Department" (the Department) from 1975 until August 29, 1991.

On August 29, 1991, Sullivan met with Great Falls Police Chief Robert Jones, Lieutenant Dave Warrington, and Detective Tim Shanks at the police station at their request. At the meeting, Chief Jones confronted Sullivan about allegations that large sums of money were missing from the department. Chief Jones asked Sullivan whether he had been taking golf course driving range money, winter golf lesson money, and golf course membership money for personal use. Sullivan told him that the money was used for Department projects, not his personal use. Sullivan asked to speak with City Manager John Lawton, who came to the police station after Chief Jones called him.

During this meeting, Mr. Lawton stated that he viewed the matter very seriously and that he was contemplating terminating Sullivan, suspending him with pay pending an investigation, or suspending him without pay pending an investigation. The next day, August 30, 1991, Sullivan resigned. Following his resignation and throughout the trial the Sullivan case received widespread local news coverage.

On November 15, 1991, the State charged Sullivan by information with five counts of felony theft, in violation of § 45-6-301(1)(b), MCA; tampering with public records or information by accountability, a felony, in violation of § 45-2-302(1) and

3

§ 45-7-208, MCA; and official misconduct, a misdemeanor, in violation of § 45-7-401, MCA.

On March 31, 1992, Sullivan filed a motion requesting the court to set a date for a preliminary pretrial conference. On April 6, 1992, Sullivan filed a motion to dismiss Counts I, II, III, IV, and VII of the information. Sullivan also filed a motion for individualized, sequestered voir dire, and various motions in limine. Three days prior to trial, on April 17, 1992, the court held an omnibus hearing. The court granted Sullivan's motion to depose Richard Duarte, and his motion for individualized, sequestered voir dire. The court dismissed one felony theft charge concerning swimming pool locker money and ordered Sullivan to stand trial on the following renumbered counts:

I: felony theft of city driving range money;

II: felony theft of golf club storage fees belonging to Connie Crammer;

III: felony theft of golf lesson money belonging to Bill Dunn or Connie Crammer;

IV: felony theft of golf course membership money;

V: felony accountability for tampering with public records by causing his secretary "to knowingly make false entries or false alterations of golf membership records"; and

VI: a misdemeanor count for "official misconduct" in "ordering his employees to provide funds for the 1991 Icebreaker Run from other budgets outside of the established budget for the Run."

4

On April 29, 1992, the jury found Sullivan guilty of three counts of theft and one count of tampering with public records by accountability. The jury found Sullivan not guilty of one count of theft and the charge of official misconduct. On May 11, 1992, Sullivan filed a motion to correct the verdict and a motion for a new trial. The court denied both motions. The court sentenced Sullivan to serve four 10-year concurrent sentences in the Montana State Prison with all but 30 days of the time suspended. As a condition of his suspended sentences, the court ordered Sullivan to pay $5644.68 in costs and restitution payable in the amount of $300 per month to the City of Great Falls for ten years starting from June 26, 1992. The court also sentenced Sullivan to be fined $7089.30 of his vacation pay and $8699.63 of his sick leave to be paid to the Great Falls United Way. In addition, Sullivan was sentenced to 2000 hours of community service with the Great Falls Salvation Army.

## ISSUE 1

Did the District Court err in failing to hold an omnibus hearing at least 30 days prior to trial pursuant to § 46-13-110, MCA, thereby prejudicing defendant?

Our standard of review relating to conclusions of law is whether the trial judge's interpretation of the law is correct. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

Defendant argues that the District Court's violation of § 46-13-110, MCA, constitutes reversible error. Defendant asserts

5

that holding the omnibus hearing 30 days prior to trial would have ensured timely consideration of pretrial motions and issues and would have avoided confusion and error.

Section 46-13-110, MCA, provides in part:

(1) Within a reasonable time following the entry of a not guilty plea but not less than 30 days before trial, the court shall hold an omnibus hearing.
(2) The purpose of this hearing is to expedite the procedures leading up to the trial of the defendant.

On January 16, 1992, Judge Sherlock, defendant, and the State held a telephonic scheduling conference in which the parties agreed to a trial date, a date to file pretrial motions, and an omnibus hearing scheduled for April 17, 1992. The record shows that prior to the omnibus hearing the court received, read, and understood the issues presented by the parties. The court heard arguments from both sides and addressed the issues raised in each motion at the omnibus hearing.

Defendant argues that three issues in particular were compromised by holding the omnibus hearing three days prior to trial.

First, defendant contends that discovery of documents previously requested from the City was not yet complete. The record shows that the court held a telephonic discovery conference on April 7, 1992, at which time the court ordered the State to provide discovery material to defendant. The court ordered the City to provide defendant access to its files. The State complied with the order with the exception of two items. The State produced

6

these items after the court addressed the issue at the omnibus hearing.

Second, defendant notes that the court granted his motion for individualized, sequestered voir dire, but subsequently modified the ruling to the great prejudice of defendant. The motion for a sequestered voir dire was granted at the omnibus hearing. There is nothing in the record to show how defendant was prejudiced by granting this motion. Likewise, there is nothing in the record to show that the subsequent modification of this ruling was the result of holding the omnibus hearing three days before trial, rather than thirty days.

Third, defendant contends that the deposition of Richard Duarte, authorized at the omnibus hearing, was not completed until April 20, 1992, and that the deposition of Michael Clark (Richard Duarte's stepson) was denied. Defendant filed the motion to compel the deposition of Richard Duarte and Michael Clark on April 15, 1992. The court ruled on that motion two days later at the omnibus hearing. We do not see the prejudice created by the court's timely ruling on that motion.

"The purpose of the [omnibus] hearing is to expedite the procedures leading up to the trial of the defendant." Section 46-13-110, MCA. It is clear from the record that all pretrial motions were raised, argued, considered, and disposed of by the court at the omnibus hearing. There is nothing in the record to demonstrate that defendant was prejudiced by the court's disposition of those pretrial matters.

7

We hold that the District Court did not err in failing to hold an omnibus hearing at least 30 days prior to trial.

### ISSUE 2

Did prejudicial media publicity and the District Court's refusal to grant challenges for cause preclude a fair trial for defendant?

Defendant maintains that his efforts to avoid prejudice from the publicity surrounding the case were deterred by the District Court's failure to take the necessary precautions to assure a fair trial and unbiased jury. Defendant asserts that continuous and massive publicity conditioned jurors to assume defendant's guilt. In support of this assertion, the appendix to defendant's opening brief contains 36 news articles published before and during the trial.

In cases where defendants have moved for a change of venue due to prejudicial, media publicity we have held that the publicity must be inflammatory and create a reasonable apprehension that a fair trial is not possible. State v. Pease (1987), 227 Mont. 424, 433, 740 P.2d 659, 664; State v. Nichols (1987), 225 Mont. 438, 444, 734 P.2d 170, 174; State v. Holmes (1983), 207 Mont. 176, 181, 674 P.2d 1071, 1073; State v. Paisley (1983, 204 Mont. 191, 194, 663 P.2d 322, 324.

Inflammatory publicity is characterized by

"editorializing on the part of the media or any calculated attempt to prejudice public opinion against [defendant] or to destroy the fairness of the pool from which [defendant's] prospective jurors would be drawn."

8

State v. Nichols (1987), 225 Mont. 438, 444, 734 P.2d 170, 174 (quoting State v. Armstrong (1980), 189 Mont. 407, 423, 616 P.2d 341, 350). A review of the exhibits in the appendix to defendant's brief reveals extensive news coverage that is factual rather than inflammatory.

Defendant argues that the court's refusal to grant four defense challenges for cause precluded a fair trial for defendant. The statute governing challenges for cause is § 46-16-115, MCA, which provides in part:

> (2) A challenge for cause may be taken for all or any of the following reasons or for any other reason that the court determines:
> . . . .
> (j) having a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party.

The decision of a district court judge as to the impartiality of a jury should not be set aside unless there is clear abuse of discretion. State v. Borchert (1971), 156 Mont. 315, 320, 479 P.2d 454, 457; Watson v. City of Bozeman (1945), 117 Mont. 5, 11, 156 P.2d 178, 180. As to the level of juror prejudice which would mandate disqualification, this Court said:

> It is only where they form fixed opinions of the guilt or innocence of the defendant which they would not be able to lay aside and render a verdict solely on the evidence presented in court that they become disqualified as jurors.

Great Falls Tribune v. District Court (1980), 186 Mont. 433, 439-40, 608 P.2d 116, 120 (citing Irvin v. Dowd (1961), 366 U.S.

9

717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751, 756); State v. Lewis (1976), 169 Mont. 290, 296-97, 546 P.2d 518, 522.

Defendant offers the voir dire examination of juror Price to illustrate how the court's refusal to grant a challenge for cause precluded a fair trial. Price stated that he had heard about the Sullivan case before trial, and that he believed Sullivan to be guilty. In answer to the State's questions, however, Price stated that he could set aside any prior opinions and base his decision on the evidence presented at trial. As a result, the court denied defendant's challenge for cause. In State v. Bashor (1980), 188 Mont. 397, 408-09, 614 P.2d 470, 477, this Court held that the district court did not abuse its discretion in refusing the challenge for cause of a juror whose answers to defense counsel which, if standing alone, would indicate she could not give a fair opinion in the case. When further questioned by the court, the juror made it clear that she could put aside her emotions and judge the defendant fairly and solely on the evidence presented at trial.

In the present case, the District Court instructed prospective jurors that they must base their verdict on the evidence and put aside anything they had read in the papers or had seen on television regarding the case. The court instructed the jurors not to discuss the case with anyone, not to read about the case, not to listen to radio broadcasts about the case, and not to watch television coverage about the case. During voir dire, both the State and defendant informed the jurors that defendant was presumed innocent, and that the State carried the burden of proving

10

defendant's guilt beyond a reasonable doubt. Both the State and defendant questioned potential jurors about their prejudices. The impaneled jurors stated that they would be able to base their verdict solely on the evidence presented in court.

The publicity generated before and during the present case, although extensive, did not rise to the level of inflammatory so as to destroy the objectivity of the jury pool. Defendant has failed to demonstrate the prejudicial effect of that publicity. The record shows that the District Court carefully instructed both potential and impaneled jurors to lay aside their impressions and opinions and base their verdict on the evidence produced in court. Each juror selected to sit assured the District Court that his or her verdict would be based solely on the evidence produced in court. The record reveals no abuse of discretion by the District Court in determining whether prospective jurors were fit to serve.

We hold that neither media publicity nor the District Court's refusal to grant challenges for cause precluded a fair trial for defendant.

### ISSUE 3

Did the District Court err by limiting the testimony of Sue Duarte, excluding the testimony of Richard Duarte, and failing to grant defendant's motion for a mistrial?

On April 15, 1992, defendant's counsel interviewed former Department employee, Richard Duarte, by telephone. Mr. Duarte stated that in 1985 or 1986 his stepson, Michael Clark, told him that he found $32,000 in Wadsworth Park. Mr. Duarte then told

11

defendant's counsel that Michael was bragging and never found any money. On April 15, 1992, defendant's counsel also interviewed Sue Duarte, wife of Richard and defendant's former administrative assistant. Mrs. Duarte stated that she knew nothing about Michael finding $32,000.

During a second interview with defendant's counsel, Mr. Duarte admitted that Michael found $3250 in a bag in Wadsworth Park. Mr. Duarte suspected it was drug money. He stated that Mrs. Duarte wanted him to turn the money in. Instead he hid the money in his garage, and in 1986 he began to gamble the money away.

Defendant filed a motion to compel the deposition of Mr. Duarte and Michael. The State filed a motion in limine to exclude any testimony concerning the money found by Michael in 1985. During the April 17 omnibus hearing, the court heard arguments on this and other motions. The court questioned whether finding money in 1985 was relevant to alleged crimes committed in 1989, 1990, and 1991. Defendant theorized that the money in question was not $3250 found in 1985 by Michael, rather, it was $32,000 stolen from the Department by the Duartes during the years 1989, 1990, 1991.

The court allowed defendant to depose Mr. Duarte for the purpose of determining when Michael found the money. Defendant was not able to locate Michael for deposition. The court reserved ruling on a motion to depose Mrs. Duarte for the purpose of attacking her credibility. During his deposition, Mr. Duarte testified that in 1985 Michael found $3250 in a bag in Wadsworth Park. Mr. Duarte admitted that neither he nor his wife told the

12

truth about the money during their first interview with defendant's counsel on April 15, 1992.

At trial, the court heard argument in chambers on the issue of cross-examining Mrs. Duarte for the purpose of attacking her credibility with prior inconsistent statements about Michael finding money. While in chambers, the State asked permission to question Lt. Warrington about information relevant to Michael finding the money. Lt. Warrington testified he learned through a tipster that in 1986 Michael Clark and another boy named LaVoie found a large sum of money. The tipster informed Lt. Warrington that the money belonged to a known drug dealer who was a neighbor of the LaVoies. Mrs. LaVoie spoke with an attorney about the money. Lt. Warrington contacted that attorney on the morning of April 23, 1992. The attorney recalled speaking with Mrs. LaVoie about the money six or seven years previously.

The court decided that it would allow defendant to attack Mrs. Duarte's credibility but limited cross-examination to her prior inconsistent statements concerning her knowledge of whether her son found any money. Defendant then moved for a mistrial in light of the testimony of Lt. Warrington. The court denied this motion. Mrs. Duarte testified that although she first denied any knowledge of the money, she knew that Michael and a friend found a large sum of money in 1985.

Defendant moved to introduce Mr. Duarte's deposition. The court denied the motion, reasoning that since Mr. Duarte had

13

testified the money was found in 1985 any other testimony from him would be collateral.

Defendant argues that limiting the cross-examination of Mrs. Duarte violated his right to confront an adverse witness and precluded him from proving his alibi.

The defendant's right to confront and cross-examine an adverse witness is grounded in the Sixth Amendment to the United States Constitution, and Article II, Section 24, of the Montana Constitution. However, limiting the scope of cross-examination does not necessarily violate a defendant's right to confront an adverse witness. Sloan v. State (1989) 236 Mont. 100, 104-05, 768 P.2d 1365, 1368. A trial court has broad discretion to limit the scope of cross-examination to those issues it determines are relevant to the trial. United States v. Kennedy (9th Cir. 1983), 714 F.2d 968, 973, cert. denied (1984), 465 U.S. 1034, 104 S. Ct. 1305, 79 L. Ed. 2d 704.

The District Court properly exercised its discretion by limiting the cross-examination of Mrs. Duarte to the relevant issue of her credibility.

Defendant further argues that the District Court committed error by suppressing the deposition testimony of Mr. Duarte. Mr. Duarte testified that in 1985 Michael Clark found $3250 which Mr. Duarte believed to be drug money. The District Court excluded Mr. Duarte's testimony out of a concern that introducing collateral matters from 1985 into a trial about crimes that were committed

14

from 1989 through 1991 would confuse the jury and result in unnecessary delay.

Our standard of review relating to discretionary trial court rulings is whether the trial court abused its discretion in allowing (or disallowing) the evidence. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 475, 803 P.2d 601, 603-04.

Admission of evidence is governed by the Montana Rules of Evidence. Rule 402, M.R.Evid., states in part: "Evidence which is not relevant is not admissible." Rule 401 defines relevant as "[e]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The District Court correctly determined that once Mr. Duarte testified that Michael found the money in 1985, his testimony became irrelevant, and therefore, the testimony was properly excluded.

Defendant contends that his motion for mistrial should have been granted following Lt. Warrington's in-chamber testimony about Michael Clark and the found money.

"The standard of review for reversing a lower court's denial of a motion for mistrial requires clear and convincing evidence that the trial court's ruling was erroneous." State v. Gollehon (1993), 262 Mont. 293, 302, 864 P.2d 1257, 1263; State v. Gambrel (1990), 246 Mont. 84, 91, 803 P.2d 1071, 1075; State v. Salois (1988), 235 Mont. 276, 282, 766 P.2d 1036, 1310. Lt. Warrington's testimony focused on the circumstances surrounding Michael Clark

15

finding money in 1985 or 1986 and Lt. Warrington's suspicion that the money might have been drug money.

We hold that there was no clear and convincing evidence in the record to show that the court's denial of defendant's motion for a mistrial was erroneous.

## ISSUE 4

Did the District Court err in refusing to dismiss or reverse Counts I, III, IV, and V of the information on the grounds of insufficiency of evidence?

When the issue on appeal is whether there was sufficient evidence to support a jury verdict, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. McLain (1991), 249 Mont. 242, 246, 815 P.2d 147, 150.

Defendant was convicted of Count I, theft of golf course driving range money, pursuant to § 45-6-301(1)(b), MCA, which provides:

> (1) A person commits the offense of theft when the person purposely or knowingly obtains or exerts unauthorized control over property of the owner and:
> . . . .
> (b) purposely or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property . . . .

Defendant argues that his conviction was based solely on circumstantial evidence that failed to establish his guilt beyond a reasonable doubt. "A conviction may be based on circumstantial evidence alone." State v. Bromgard (1993), 261 Mont 291, 295, 862

16

P.2d 1140, 1142; State v. Atlas (1986), 224 Mont. 92, 95, 728 P.2d 421, 423. "When circumstantial evidence is susceptible to two interpretations, one which supports guilt and the other which supports innocence, the trier of fact determines which is the most reasonable." State v. Tome (1987), 228 Mont. 398, 401, 742 P.2d 479, 481.

Golf pro Bill Dunn testified that defendant instructed him to withhold from the daily deposit one-third of the money collected from the sale of driving range balls. Mr. Dunn was directed to turn that money over to defendant. Defendant informed Mr. Dunn that the money would be used for the Ice Breaker Run, the pet and doll parade, and T-shirts. There is no record of this money being deposited into City or Department accounts for these purposes, nor is there any evidence to show that defendant used any of the driving range money he collected for these purposes.

Based on the facts and circumstances, the jury, as trier of fact, found that the most reasonable explanation for the missing golf club membership money and the missing driving range money was theft by defendant.

Defendant was found guilty of Count III, felony theft of golf lesson money belonging to Bill Dunn and Connie Crammer, pursuant to § 45-6-301, MCA.

Dunn and Crammer taught winter golf lessons. Teaching winter golf lessons was not part of their employment contracts with the City. Students paid either instructor directly. Defendant contends that he solicited financial contributions from Dunn and

17

Crammer to support the Ice Breaker Run and the pet and doll parade. According to defendant, Dunn and Crammer voluntarily contributed $3000 to $4000 per year to defendant. Dunn and Crammer testified that defendant instructed them to turn over one-third of their golf lesson money to him. There is no record of any portion of this money being deposited into City or Department accounts. Viewed in the light most favorable to the prosecution, the evidence supports the jury's verdict as to Count III.

Defendant was found guilty of Count IV, theft of City golf course membership money, pursuant to § 45-6-301, MCA. Defendant again argues that his conviction was based solely on circumstantial evidence that failed to establish his guilt beyond a reasonable doubt. As with Count I, we find that the jury, as trier of fact, determined that the most reasonable interpretation of the circumstantial evidence presented at trial was defendant's guilt as to Count IV.

Defendant was found guilty of Count V, tampering with public records, pursuant to § 45-7-208, MCA, which provides in part:

(1) A person commits the offense of tampering with public records or information if he:
(a) knowingly makes a false entry in or false alteration of any record, document, legislative bill or enactment, or thing belonging to or received, issued, or kept by the government for information or record or required by law to be kept by others for information of government . . . .

Golfers paid for City golf course memberships with cash, check, or both. Dunn, or someone on his staff, would tabulate the receipts from memberships sold and the amount of membership money

18

collected to be sure the two balanced out. Dunn testified that they always balanced out. Defendant, rather than a park security guard, picked up membership money with the daily deposit and report and delivered them to the Department for Mrs. Floerchinger to deposit. She testified that the amount of money she received from defendant was usually less than the number of memberships sold. Mrs. Duarte prepared an annual golf report which detailed the number of City golf course memberships sold and the money deposited into the Department account from those sales. Mrs. Duarte informed defendant of discrepancies between the number of memberships sold and the amount of money deposited. From 1983 to 1989, defendant instructed Mrs. Duarte to change the number of memberships sold to match the amount of money deposited.

The record supports a finding by the jury that defendant tampered with public records by directing his assistant to knowingly make false entries or alterations to the annual golf membership report.

We hold that the District Court did not err when it refused to dismiss or reverse Counts I, III, IV, and V of the information for insufficiency of evidence.

### ISSUE 5

Did the District Court err in fining defendant his vacation pay and sick leave pay and ordering those funds be paid to the United Way of Cascade County?

Included in defendant's sentence the District Court ordered the following:

19

The defendant's vacation pay in the amount of $7,089.30 and sick leave in the amount of $8,699.63 (total: $15,788.93) are to constitute a fine hereby levied against him. These funds shall be paid to the Great Falls United Way.

Prior to the entry of judgment, but after the court made known it intended to levy the fine, defendant's attorney notified the court that it held a prior lien on defendant's sick leave and vacation pay. It is not clear from the record that the defendant is able to pay the fine levied by the court.

We remand for further proceedings on that part of the order that levies a fine against defendant in accordance with § 46-18-231, MCA, which states:

(1) Whenever, upon verdict or a plea of guilty, a person has been found guilty of an offense for which a felony penalty of imprisonment could be imposed, the court may impose a fine, only in accordance with subsection (3), and in lieu of or in addition to a sentence of imprisonment. . . .
. . . .
(3) The court may not sentence a defendant to pay a fine unless the defendant is or will be able to pay the fine. In determining the amount and method of payment, the court shall take into account the nature of the crime committed, the financial resources of the defendant, and the nature of the burden that payment of the fine will impose.
(4) Any fine levied under this section in a felony case shall be in an amount fixed by the court not to exceed $50,000.

The court further ordered that the fine be paid to the Great Falls United Way. We reverse and remand this part of the judgment for further proceedings in accordance with § 46-18-603, MCA, which provides:

All fines and forfeitures collected in any court except city courts must be applied to the payment of the costs of the case in which the fine is imposed or the

20

forfeiture incurred.   After such costs are paid, the residue, if not paid to a justice's court or otherwise provided by law, must be paid to the county treasurer of the county in which the court is held and by him credited as provided by law.

Affirmed in part, reversed in part, and remanded for clarification.

_____
        Justice

We concur:

_____
Chief Justice

_____

_____
Justices

Justice Karla M. Gray, dissenting.

While I agree with most of the Court's opinion, I dissent on the issue of the District Court's denial of Sullivan's challenge for cause of juror Price. I would reverse on that issue.

I agree with the Court that our standard of review of a district court's denial of a challenge for cause is whether the court clearly abused its discretion. I disagree, however, with the Court's statement of the level of juror prejudice which mandates disqualification. The Court relies on Great Falls Tribune v. District Court (1980), 186 Mont. 433, 608 P.2d 116 and State v. Lewis (1976), 169 Mont. 290, 546 P.2d 518. It ignores our recent decision on challenges for cause--State v. Williams (1993), 262 Mont. 530, 866 P.2d 1099--and in so doing, reaches an erroneous conclusion.

Section 46-16-115(2)(j), MCA, authorizes a challenge for cause of a juror "having a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party." Here, Sullivan challenged juror Price on that basis after voir dire examination.

The transcript of Mr. Price's voir dire reflects that Mr. Price first stated he had his mind made up; then, that he really did not know how it would be possible for him to set aside the opinion he had already reached; then, that there was a possibility that he either could or could not put aside everything he had heard; and, finally, that it would be difficult for him to sit on

22

the case with a completely blank mind. At very best, this record establishes Mr. Price's repeated expressions of concern about his ability to be impartial.

The prosecution followed up by trying to rehabilitate Mr. Price. To a question as to whether—if picked for the jury—he would make his decision based solely on the evidence, Mr. Price responded that "[i]f I sat through this court, I am going to make my decision on what's in here." Then, the following two exchanges:

MR. HUDSPETH: You can put what went on beforehand aside?

MR. PRICE: I think I could.

MR. HUDSPETH: Make your best efforts to do that which means you will follow your oath as a juror?

MR. PRICE: Yes.

The best the prosecutor could do with Mr. Price was one firm answer as to making a decision on the evidence, followed by two equivocal answers of the "I think" and "best efforts" mode. Mr. Price ultimately sat on the jury and found Sullivan guilty of four of the charged offenses.

We set forth new standards concerning denials of challenges for cause in Williams just a year ago. Applying those standards here mandates a conclusion that there is a reasonable possibility that the denial of Sullivan's challenge for cause of juror Price contributed to his conviction.

In Williams, the challenged juror candidly and repeatedly expressed her concern about her ability to be impartial in the case. In the face of those admissions of bias, we determined that the district court's rehabilitation was, at best, unpersuasive, and

23

that the court abused its discretion in denying the challenge for cause. 866 P.2d at 1102-03. To this point, Williams and Sullivan's situation are essentially identical, except that here it was the prosecutor's attempted rehabilitation that was substantially less than persuasive.

We went on in Williams to reject a black-and-white rule that an abuse of discretion regarding a challenge for cause is conclusively prejudicial. Instead, we determined that: (1) where an abuse of discretion occurs in denying a challenge for cause; and (2) the party making the challenge is required to use a peremptory challenge to remove the juror; and (3) the party uses all of his or her peremptory challenges; then (4) a presumption of prejudice arises. Williams, 866 P.2d at 1103. We stated we would balance the presumption against the totality of the circumstances to determine whether the error contributed to the defendant's conviction. Id. There, the question boiled down to whether, in the face of basically uncontradicted evidence against the defendant, his use of one peremptory challenge to remove the juror who should have been removed for cause--leaving him five instead of six--reasonably could have contributed to his conviction. We concluded that it could not. Williams, 866 P.2d at 1104.

The case before us now mandates a different result. Here, the juror challenged for cause actually sat on the jury. The evidence was not uncontradicted or overwhelming on the offenses charged; indeed, the jury acquitted on two counts. Sullivan used his peremptory challenges on other jurors he was even more concerned

24

about than juror Price, including several he had unsuccessfully challenged for cause. Under these circumstances, I conclude that there is a reasonable possibility that the District Court's denial of Sullivan's challenge for cause contributed to his convictions.

We emphasized in <u>Williams</u> that the facts of that case were unique, and that the result in that case should not lead prosecutors or district courts to any false sense of security in future cases. We cautioned trial courts that "when voir dire examination discloses a serious question about a juror's ability to be fair and impartial, that question should be resolved in favor of excusing that juror." 866 P.2d at 1104-05. The Court's failure to apply, or even cite to, <u>Williams</u> in this case essentially nullifies that unanimous decision which less than a year ago changed our approach to questions involving denials of challenges for cause. It also results in a failure to provide Sullivan with a fair trial--which, at its most fundamental level, must surely mean a trial by an impartial jury. I dissent.

_____
Justice

25

September 12, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

George Robert Crotty, Jr.
Graybill, Ostrem & Crotty
No. 18 Sixth St. No., Ste. 200
Great Falls, MT 59401

Hon. JOSEPH P. MAZUREK, Attorney General
Micheal Wellenstein, Assistant
215 No. Sanders
Helena, MT 59620

Patrick Paul
Cascade County Attorney
Courthouse
Great Falls, MT 59401

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _D. Gallagher_
Deputy